N. G. Basevi, Inc. v. Commissioner.
N. G. Basevi, Inc. v. Commissioner
Docket No. 6904.
United States Tax Court
1946 Tax Ct. Memo LEXIS 178; 5 T.C.M. (CCH) 450; T.C.M. (RIA) 46124; May 29, 1946
Harry L. Schein, Esq., 1450 Broadway, New York, N. Y., for the petitioner. Thomas R. Charshee, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioner's income tax and declared value excess-profits tax for the calendar year 1941 in the respective amounts of $1,027.26 and $268.67, and in its income tax declared value excess-profits tax, and excess profits tax for the calendar year 1942 in the respective amounts of $173.16, $1,652.38 and $15,084.65. The deficiencies for 1941 resulted in part fro the disallowance of a deduction of $2,745 claimed in its return for that year as part of the salary paid its president, which disallowance the respondent now concedes *179 was erroneous. The issues which remain in dispute relate to the disallowance of a deduction for 1942 in the amount of $15,547.60 as salary paid the president of petitioner corporation, and the treatment in 1941 and 1942 of the cost of certain designs and engravings used in the business of the petitioner. Findings of Fact Petitioner is a corporation which was organized in 1941 in the State of New York. It filed its income and declared value excess-profits tax returns for the years 1941 and 1942 on the accrual basis with the collector of internal revenue for the second district of New York. It is engaged in the business of printing and publishing religious pictures. Giacomo Basevi is the president of petitioner, and its sole stockholder. He is a native of Italy, and engaged in a similar business for thirty-five years in Milan, Italy, until his business was destroyed in 1938 and 1939. He came to the United States in 1940. During the operation of his business in Italy, Basevi employed approximately five hundred employees, had gross sales of approximately $600,000 a year, and earned an income of $50,000 to $60,000 a year for himself. He distributed and sold his products throughout *180 the world under a trademark consisting of the initials "N.B." enclosed within a diamond. He traveled extensively in the interests of his business, spoke four languages fluently, and had wide and valuable contacts in many countries where his products were sold. He accumulated a collection of approximately 1,500 original paintings on religious subjects from which were made the designs and engravings used in the production of the pictures which are the chief product sold by petitioner now, and by Basevi in Italy. He was considered an expert in his field, and on occasion he testified as such in the courts of several countries. All of his subjects were copyrighted in Berne, Switzerland, and in the United States. Basevi organized the petitioner corporation in 1941, with a capital of $9,000, all of which he contributed in exchange for all the capital stock. In addition, he permitted the use of all his paintings, designs, and his trade-mark by the corporation, without any formal agreement concerning the terms of such use during the early months of the corporate activity, which began in the latter half of 1941. He was paid for his services during those months the total sum of $4,000, about *181 which there is now no dispute. During this period and through 1942, Basevi devoted himself to the establishment and expansion of the business of petitioner, working generally eleven or twelve hours a day. He organized all branches of the business, including arrangements for the manufacture of the reproductions, which involved finding a good lithographer and working in close cooperation with him in experimenting with various kinds and styles of paper, printing, colors, etc.; supervising and instructing the photographers, engravers, printers, and setting up the sales organization which finally distributed the finished product. He turned over to the corporation for its use his list of customers in all parts of the world, and made available to it his experience in dealing with them, his knowledge of the preferences and artistic tastes of the various nationalities, his familiarity with shipping problems, and generally used for the benefit of petitioner the accumulated experience of thirty-five successfully active years in that field of business. Early in 1942, petitioner to writing the terms of an agreement with Basevi concerning his compensation for services and the use of his property. *182 This agreement was in the following language: February 26, 1942 Mr. Glacomo Basevi: This is to confirm our understanding that we shall have the right to sell and distribute the religious pictures of which you own the copyrights, and we shall have the right to use your trademark, N.B., in the design that you have made known before the public for many years. This agreement shall be for a period of one (1) year, from January 1, 1942 to December 31, 1942 and shall be automatically renewed for periods of one (1) year at a time, unless either party, within thirty (30) days prior to the expiration of any yearly period, gives notice to the other by registered mail to the contrary. The title to the copyrights and trademark and any renewals shall remain with you. Since the volume of sales is so ucertain, we will not fix a definite percentage or amount at this time for your royalties on the use of the copyrights. If the sales are small, we will be willing to pay a higher percentage, but if they are higher, the percentage will be smaller, as the gross amount will be larger on a higher volume. In no event, however, shall the royalties be less than 8% nor more than 12% for the use of the *183 copyrights. For the use of the trademark N.B. we agree to pay you $5,000 - per year, beginning January 1, 1942, in addition to the royalties for the use of the copyrights. It is, of course, understood that the payments to be made to you for royalties and for the use of your trademark shall be in addition to your compensation as officer, director and employee of the corporation. The amount to be paid as royalties shall be agreed upon within thirty (30) days of the close of the year. In the event an agreement cannot be reached, it shall be decided by arbitration. Very truly yours, N. G. Basevi, Inc. By Giacomo Basevi President. Basevi's salary was informally established at $11,000. Pursuant thereto and to the terms of the written agreements, there became due and owing to Basevi for 1942 the sum of $24,000, of which he drew $6,000 in cash during the year. The balance of $18,000 was accrued by petitioner to Basevi as of 1942 on its books under an account referred to as "Compensation Account". On January 8, 1943, petitioner executed three promissory notes in the respective amounts of $3,000, $10,000 and $5,000, totaling $18,000, and Basevi executed a receipt therefor as follows: *184 RECEIPTS FOR NOTES New York, January 8, 1943 I hereby acknowledge receipt of demand notes to my order from N. G. Basevi, Inc. as follows, all dated January 8, 1943: $10,000, $5,000, $3,000, Total $18,000. I agree to accept these notes, together with the $6,000, already paid to me during the year 1942 in full payment of all sums due to me for royalties for the use by the corporation of my copyrights and for use of trademark N.B. and my salary as officer, director and employee of the corporation, I further agree to accept stock of N. G. Basevi, Inc. for the whole or any part of these notes, which stock I understand the corporation will issue for these notes and other obligations due to me. Giacomo Basevi On March 12, 1943, petitioner paid Basevi $2,452.40, leaving $15,567.60 of the indebtedness represented by the notes still unpaid. On March 9, 1943, petitioner received permission of the Secretary of State to increase its capital stock, and on March 20, 1943, 203 shares of stock were issued to Basevi in exchange for the promissory notes which were cancelled. In that portion of 1941 during which petitioner was engaged in business, its gross sales were $34,310.40, and the cost *185 of the goods sold was $24,972.31 leaving a gross profit of $9,338.09, and with expenses of $9,938.60, no net income. It had four or five employees. In 1942, petitioner had gross sales of $99,850.90 of goods which cost $35,517.32, or a gross profit of $64,333.58. Its expenses, including the item here in dispute, amounted to $58,776.67, leaving a net profit of $5,963.63. It employed eight persons during that year. Basevi's chief assistant received $10,000 salary and commissions. Consolidated balance sheets as of December 31, 1941 and 1942 are set forth below: ASSETS
1941
1942
Cash
$ 5,142.72
$ 3,877.28
Notes and Accounts Re-
ceivable
16,257.81
22,374.54
Inventories
8,990.00
43,096.00
Capital Assets
8,754.26
13,142.68
Other Assets
202.34
555.34
Total Assets
$39,347.13
$83,045.84
LIABILITIES
1941
1942
Accounts payable
$ 1,565.59
$ 1,791.05
Bonds, notes, mortgages
payable
24,500.00
37,000.00
Accrued expenses - interest,
taxes
668.92
4,013.21
Other liabilities - commis-
sions due, salaries due
officers
3,661.34
26,788.13
Capital stock
9,000.00
9,000.00
Earned surplus and undi-
vided profits
48.72
4,453.45
Total Liabilities
$39,347.13
$83,045.84
*186 Between January 1, 1943, and March 15, 1943, petitioner's cash in bank varied from a low of $2,878.98 to a high of $9,416.70. Petitioner's gross sales in 1943 were $155,569 from goods which cost $59,629, leaving a gross profits of $95,940. Expenses amounted to $74,615, leaving net profits of $21,325. In 1944, gross sales were $247,187, from goods having cost $101,919, leaving gross profit of $145,268. Expenses totaling $104,480 were deducted, resulting in gross profit of $40,788. Petitioner deducted the $24,000 paid or accrued to Basevi during 1942, and Basevi reported the entire amount for taxation although he specified in his return he was on the cash basis. Respondent allowed the deduction of $8,452.40, paid in cash, but disallowed the remaining $15,567.60, for which notes were still outstanding as of March 15, 1943. In its returns for 1941 and 1942, petitioner deducted $1,678.50 and $750, respectively, as an expense for the cost of designs. Respondent denied the deduction, and instead allowed depreciation of the items as a capital expense, based on a ten-year life. The designs in question are reproductions of the original paintings made in the desired size on photographic *187 paper, then retouched in water color by an artist, usually with an air brush. From the finished design, the engraving is made, and from this engraving are made the final reproductions which are petitioner's chief product. The designs are fragile, and the average useful life of each is less than one year, although with careful handling they can last longer. The quality of the colors is important to the process of making the engravings, and the colors are delicate and tend to fade with the passage of time. The engravings made from the designs have a useful life of five years, a fact conceded by both parties. Opinion KERN, Judge: The principal issue before us relates to the disallowance of the item of $15,084.65 which had been accrued on petitioner's books to the account of Giacomo Basevi, its sole stockholder and president during the tax year 1942. There is a disagreement between the parties on the facts as to whether the item represents salary only, as respondent contends, or whether it covers salary, compensation for the use of a copyrighted trade-mark, and royalties on sales of reproductions of copyrighted pictures, as petitioner contends. Petitioner's and Basevi's treatment *188 of the item have been substantially, but not at all times entirely consistent. The agreement between the parties provides for payment for the use of a registered trade-mark of $5,000, and royalties on the sales of copyrighted pictures of from 8 to 12 percent depending on the volume of such sales. The amount of royalties for copyrights and trade-marks which was accrued to Basevi's account on petitioner's books was arrived at in accordance with the terms of that agreement, and it has continued in effect through the subsequent years of which we have any knowledge. The account in which the book accruals were made was referred to as "Compensation Account", which is broad enough to cover the three types of compensation specified in the agreement. But in the income tax returns of both Basevi and petitioner the entire amount was referred to as compensation for personal services. At the time the notes were given, however, Basevi executed a receipt accepting the notes together with the cash already received, "in full payment of all sums due to me for royalties for the use by the corporation of my copyrights and for use of trade-mark N.B. and my salary as an officer, director and employee of *189 the corporation". We are of the opinion that the agreement was valid and effective, and that the total amounts so accrued to Basevi's account was in payment for the use of his copyrights and trade-mark as well as for his salary, notwithstanding the fact that the income tax returns labeled the entire amount as salary. Respondent disallowed the $15,084.65 item on two grounds, first, that it was not paid, and fell therefore within the prohibition of section 24 (c) of the Internal Revenue Code, and, second, that it was an unreasonable and excessive salary for Basevi. It does not seem to us to be of any practical importance whether the $24,000 is or may be allocated to the several items which it obviously was intended to cover. It could be pertinent only to a consideration of the question of reasonableness, in which case instead of determining whether $24,000 was excessive compensation for personal services, the use of the trade-mark and royalties from sales, we would have to decide whether $11,000 is reasonable compensation for personal services, $5,000 for the use of the trade-mark, and $8,000 as royalties from sales. The record shows, and respondent does not *190 deny, that the copyrights and the trade-mark, were owned by Basevi, individually, and that the parties contemplated that petitioner should use them and compensate Basevi for their use. The $24,000 covered all three types of compensation, and we are of the opinion that, whether considered as separately allocated thereto, or in a lump sum, it was not unreasonable or excessive in amount. There is abundant proof that petitioner was, in theory and in fact, a one-man corporation, and Basevi was that man. It can not be doubted that his long and successful career in the identical kind of business in Italy was a contribution of first importance to petitioner. He spent all of his time, working very long hours, to the solution of the problems encountered in the establishment of the new business of an uncommon character. He turned over to the corporation his list of customers and agents which had been the accumulation of many years of active conduct of the business in Italy, and of personal contact throughout the world. These constituted virtually a readymade market for petitioner's product, and probably account in a large measure for the healthy condition of petitioner's gross sales and collections *191 in 1942, which was its first full year of operation. The trade-mark was Basevi's individual registered property. That it had value is reflected in the substantial volume of business done by the corporation, as well as by Basevi operating individually in Italy. It was well and widely known in all the several countries in which the business was conducted. Its use by petitioner secured for petitioner at least some measure of the good will which Basevi's Italian business had built up over the years in every market in the world in which products of the exact sort now sold by petitioner had been sold by Basevi. In this respect, petitioner avoided the disadvantages usually inherent in the establishment of a new business, and secured for itself the advantages usually enjoyed only after a long period of unbroken activity in the field. The royalty specified by the contract was 8 to 12 percent of the sales, and comprehended within the sum of $24,000 is $8,000 allocable to such royalties. This is approximately 8 percent of the gross sales, and does not appear from the evidence to be excessive. After considering all of the pertinent facts, including the character, extent and value of the *192 services rendered by Basevi, the volume of business, the fact that the business, though newly established, showed excellent potentialities due to Basevi's earlier experience and activities and the good will attached to the trade-mark, that the business was increasingly and exceptionally successful in subsequent years largely due to Basevi's services, that an employee paid partly on a commission basis earned almost as much as the specified salary to Basevi, and the fact that after payment of all the disputed items and all other expenses, there remained a net profit equivalent to approximately 66 percent of invested capital, we conclude the salary was not unreasonable and excessive in amount. As a matter of fact respondent makes no contention that $11,000 is excessive compensation for Basevi, and no contention that the amount of $5,000 paid for the use of the trade-mark, or the 8 percent royalty paid on the gross sales of reproductions of copyrighted articles are not ordinary and necessary. His contention is that the entire amount was compensation for Basevi's services only, a conclusion with which we can not agree in view of the evidence before us, for the reasons which we have already *193 given. Having decided that the payments were ordinary, necessary and reasonable in amount, we are confronted with respondent's contention that they are not deductible by petitioner corporation by reason of the provisions of section 24 (c) of the Internal Revenue Code. Section 24 (c) prohibits the deduction of certain items when a certain relationship exists between taxpayer and the payee of the amount sought to be deducted, and when the item, if not paid, would not be includible in the payee's taxable income, and if the payment is not made within 2 1/2 months after the close of the taxable year. Respondent contends that the three essential factors are coexistent here and that the deduction is therefore not permissible. Petitioner concedes the existence of the relationship of corporation and sole stockholder, but denies the existence of the remaining essential factors. It contends, first, that since Basevi returned as taxable income, and paid the tax on, the entire $24,000, although he admittedly did not receive it during the tax year, he was on an accrual basis of accounting, which was the same basis as the corporation, although he stated on the return *194 that he was on a cash basis, and that if he were on an accrual basis the second requirement of 24 (c) would not be present. We are not at all convinced that Basevi used the accrual method of accounting in connection with his individual affairs. In fact, there is no evidence in the record from which we could find he kept any books and records. If he did not, he could not claim to have been on the accrual basis. See John A. Brander, 3 B.T.A. 231; Daniel Hecker, 17 B.T.A. 874; Mansuss Realty Co., 1 T.C. 932, 936. The only fact from which we could draw any such inference, is, as petitioner, suggests, the fact that he did return the amount for taxation, although he did not actually receive it. But this could be just as fairly attributed to a belief that he was chargeable with either actual or constructive receipt and the theory would not imply any inconsistency on his part in indicating on his return that he was on a cash basis. We regard this the more likely explanation, as well as the more tenable position. Petitioner contends, and respondent denies, that the amounts were paid within two and one-half months after the close of the tax year, when *195 promissory notes, payable on demand, were issued by petitioner on January 8, 1943, which notes were accepted by Basevi in full payment of the unpaid balance due him. Respondent does not deny that Basevi accepted the notes as payment of his account, and recognizes the rule established by Musselman-Hub-Brake Co. v. Commissioner, 139 Fed. (2d) 65, that notes given for services constitute payment to the extent of their fair market value. Cf. P. G. Lake, Inc., 4 T.C. 1. However, it is respondent's position that the notes had little or no fair market value. The evidence shows that the payee accepted the notes in full payment of his account; that petitioner's liabilities, except for the notes held by Basevi, were small; that petitioner's assets were comfortably in excess of all its liabilities, including the amount of the notes in question; that petitioner could have borrowed enough on its accounts receivable alone to have discharged the notes; that it had in addition an inventory worth more than $43,000; that its business was expending at an impressive rate; and that its accounts receivable were readily collectible. We have no difficulty in deciding, on these *196 facts, that the notes were worth their full face value, and that they constitute payment within the meaning of section 24 (c)(1) of the Internal Revenue Code, so that the denial of the deduction may not be justified by the terms of section 24 (c). The remaining issue concerns deductions which petitioner took in its 1941 and 1942 returns for the cost of designs in the respective amounts of $1,678.50 and $750. Respondent held these designs to be capital assets, depreciable over a period of five years. The designs are photographs of the original paintings, colored by artists. From them are made engravings, from which the finished product is made. There is evidence that the average useful life of the designs is less than a year, although they could in some cases, with careful handling, last much longer. The colors are delicate, and are applied by hand in water color with air brushes. The quality of the color is extremely important to the engraving from which the finished pictures are made, and if the colors have faded or been rubbed off by contact with other objects, the design is not usable regardless of the condition of the paper. There is, we think, enough evidence *197 in the record to overcome the presumption of correctness which attaches to the respondent's determination. We are of the opinion that the average useful life of the designs is one year or less, and the petitioner should therefore be allowed to deduct their cost. The parties have agreed that the engravings made from the designs have an average useful life of five years. Decision will be entered under Rule 50.